## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICHARD R. REILLY, as Administrator of the Estate of Veronique Aundrea Henry, Deceased,** | : |
| | :    C.A.  No. 1:18-cv-1803-YK |
| **Plaintiff,** | : |
| | :    **Honorable Yvette Kane** |
| **v.** | : |
| | :    **JURY TRIAL DEMANDED** |
| **YORK COUNTY** | |
| **and** | : |
| **BOARD OF INSPECTORS OF THE YORK COUNTY PRISON** | : |
| **and** | : |
| **WARDEN MARY SABOL** | : |
| **and** | |
| **CORRECTIONAL OFFICER LYNETTE MOORE** | : |
| **and** | : |
| **CORRECTIONAL OFFICER MARIA STREMMEL** | : |
| **and** | |
| **PRIMECARE MEDICAL, INC.** | : |
| **and** | |
| **SONYA FREY, LPN** | : |
| **and** | |
| **AMANDA SPAHR, MA** | : |
| **and** | |
| **JOHN DOES I - V,** | : |
| | |
| **Defendants.** | : |

## SECOND AMENDED COMPLAINT

Plaintiff Richard R. Reilly, as Administrator of the Estate of Veronique Aundrea Henry, deceased ("plaintiff"), by and through his attorneys, Joshua A. Anstine, Esquire and the Law Offices of Dale E. Anstine, P.C., and Leticia Chavez-Freed, Esq., of The Chavez-Freed Law Office,  hereby asserts the following Complaint against defendants, York County, the Board of Inspectors of the York County Prison, Warden Mary Sabol, Correctional Officer Lynette Moore, Correctional Officer Maria Stremmel, (collectively "correctional officer defendants"), and PrimeCare Medical Inc., Sonya Frey, LPN, and Amanda Spahr, MA, (collectively "medical defendants"), and John Does I-V (all defendants collectively "defendants") as follows:

### Parties

1. Plaintiff Richard R. Reilly is the Administrator of the Estate of Veronique Aundrea Henry, deceased ("Ms. Henry").   Ms. Henry was at all material times a resident of York County, Pennsylvania.

2. Defendant York County is a Municipality of the Commonwealth of Pennsylvania and is an incorporated county within the Commonwealth of Pennsylvania with a population of approximately 440,000 residents, thereby making it a County of the Third Class pursuant to 16 P.S. § 210.  Defendant York County has direct oversight responsibility for York County Prison pursuant to the organizational chart of York County promulgated in Chapter

73 of the York County Ordinances.  *See* Exhibit B, filed herewith.

3.   Defendant Board of Inspectors of the York County Prison ("York County

Prison Board" or "Prison Board") was established pursuant to 61 Pa. C.S. §

1731 for the purpose of "provid[ing] for the safekeeping, discipline, and

employment of inmates and the government and management of the

correctional institution."  *Id.*

4.   At all times relevant hereto, York County and/or the Prison Board employed

Warden Mary Sabol, Correctional Officer **(**CO) Lynette Moore and

Correctional Officer (CO) Maria Stremmel.

5.   Defendant Warden Mary Sabol ("defendant Sabol") was at all times relevant

to this action an agent of York County and/or the Prison Board.

6.   Defendant CO Lynette Moore ("defendant Moore") was at all times relevant

to this action an agent of York County and/or the Prison Board and a

correctional officer at YCP.  She is being sued in her individual capacity as

an officer of YCP and York County and/or the Prison Board.

7.   Defendant CO Maria Stremmel ("defendant Stremmel") was at all times

relevant to this action an agent of York County and/or the Prison Board and a

correctional officer at YCP.  She is being sued in her individual capacity as

an officer of YCP and York County.

8.   Defendant PrimeCare Medical Inc. ("defendant PrimeCare") is a for-profit

Pennsylvania corporation with its principal place of business located at 3940

Locust Lane, Harrisburg, PA.  At all times relevant hereto, PrimeCare was the contracted agent of YCP and York County and/or the Prison Board, and was responsible for providing staff and overseeing medical treatment to inmates at YCP.  At all times material hereto, PrimeCare acted and failed to act by, through and on behalf of its duly authorized agents, ostensible agents, servants and employees, including, but not limited to Sonya Frey, LPN, and Amanda Spahr, MA.

9.  Defendant Sonya Frey, LPN ("defendant Frey") was at all times relevant to this action a duly licensed practicing nurse at YCP in York, PA.

11.  At all times material hereto, defendant Frey was a treating nurse acting individually and/or as an agent, ostensible agent, servant and/or employee of York County and/or the Prison Board and PrimeCare.

12.  Defendant Amanda Spahr, MA ("defendant Spahr") was at all times relevant to this action a medical assistant practicing at YCP in York, PA.

13.  At all times material hereto, defendant Spahr was a treating medical assistant acting individually and/or as an agent, ostensible agent, servant and/or employee of York County and/or the Prison Board and PrimeCare.

14.  Defendants John Does I-V are medical providers practicing at YCP in York, PA and/or correctional officers or other prison personnel at YCP.

15.  At all material times, defendants, York County and/or the Prison Board were charged with the responsibility of providing adequate medical care and to and

4

protecting the pretrial detainees/inmates housed at YCP, including Ms. Henry,

and delegated that constitutional duty to defendants, the Prison Board,

PrimeCare and/or Warden Mary Sabol, as well as their employees.

## **Jurisdiction**

16.    This action is brought pursuant to 42 United States Code Section 1983.

Jurisdiction is based upon 28 United States Code 1331, 1341 (1), (3) and (4),

and 1343(a)(3), and 1343(a)(4).  Plaintiff further invokes the supplemental

jurisdiction under 28 United States Code Section 1376(a) to hear and decide

claims under state law.

## **Facts**

17.    On September 14, 2016, at approximately 10:30 p.m., Ms. Henry was

admitted to YCP following an arrest for serious crimes, including double

homicide.

18.    As part of YCP's admission process, YCP and/or PrimeCare staff conduct

Intake of all prisoners when they are admitted.

19.    During Intake, YCP and/or PrimeCare staff gather basic information from

prisoners, including the prisoner's medical history.

20.    A prisoner's medical information includes the prisoner's mental health

history, as well as an assessment of the prisoner's current mental health

status and suicide risk.

5

21.   Defendant Spahr conducted the Ms. Henry's Intake which, among other things, consisted of asking Ms. Henry various medical and mental health questions and then entering her answers in a computer program.

22.   Defendants Stremmel and Moore were present during Ms. Henry's admission process and were immediately concerned that she was at risk for suicide.

23.   Defendants Stremmel and Moore knew Ms. Henry from her prior incarcerations;  Defendant Stremmel, in particular, immediately detected a "red flag" in that Ms. Henry's personality, affect, and conversation were out of character and somber.

24.   Defendant Moore noted that on this occasion Ms. Henry appeared to be acting very solemn and differently, in a manner that made defendant Moore concerned Ms. Henry might hurt herself.

25.   Defendant Moore also believed that the homicide charges against Ms. Henry alone were a sufficient reason for placing Ms. Henry on suicide watch.

26.   YCP's training materials provide that prisoners' highest risk for suicide is the first two days after admission.

27.   Ms. Henry's prison records from her previous incarcerations documented that she had an existing mental health condition and ~~that she~~ had been on medication for mental health issues, including depression.

28.   Ms. Henry's prison records from her  previous incarcerations indicated that

on prior occasions, she has asked to speak with a psychiatrist or other mental

health medical provider and that she has contemplated suicide.

29. Based on their observation of Ms. Henry, defendant Moore, defendant

Stremmel, and/or other John Doe correctional officers moved Ms. Henry to

the medical holding tank, where they could watch her, pending an

assessment of her risk for suicide.

30. The known concern that Ms. Henry would commit suicide was so great that

defendant Moore, in consultation with defendant Stremmel and/or other

John Doe correctional officers, called the YCP medical staff and requested

that a nurse speak with Ms. Henry to evaluate her for suicide precautions.

31. Mental health staff are not physically on the premises at YCP seven days a

week, 24 hours a day; mental health clinicians are only at YCP during day

hours.

32. When Ms. Henry was admitted, no mental health professional was

physically present at YCP.

33. On September 14, 2016, defendant Frey, an LPN, was the second shift

"charge nurse" on duty.  As the charge nurse, defendant Frey was responsible

for the medical emergencies.

34.  By 11:15 p.m., defendant Frey's shift was coming to an end and she was

being replaced by the third shift charge nurse.

35. As a courtesy to the third shift charge nurse, defendant Frey responded to the

request by defendants Stremmel and Moore for a medical professional to

assess Ms. Henry.

36.   Defendant Frey was not qualified to conduct a mental health assessment or

determine whether Ms. Henry was a suicide risk.

37.   Unlike defendants Stremmel and Moore, defendant Frey was unfamiliar with

Ms. Henry.

38.   In the presence of defendants' Stremmel and Moore, Defendant Frey met

Ms. Henry in the medical holding tank and began asking her a series of

boilerplate questions, such as whether she wanted to harm herself, etc.

39.   All defendants knew that Ms. Henry had been admitted to YCP on serious

charges, including double homicide, and was therefore facing possible

incarceration for a substantial period of time, to include a potential life

sentence.

40.   Ms. Henry told defendant Stremmel and/or others that she had a husband

and two children and that her husband was very physically and mentally

abusive to her.

36.   Ms. Henry stated to one or more defendants that she took Paxil for anxiety

before being admitted to YCP.

37.   Defendant Moore and defendant Stremmel told defendant Frey that they

believed Ms. Henry should be on suicide watch because they were

concerned that she would attempt to commit suicide.

8

38.   After questioning Ms. Henry, defendant Frey concluded that Ms. Henry was not at risk for suicide, did not require any suicide precautions, and could be housed in general population.

39.   When defendants Stremmel and Moore voiced their disagreement, defendant Frey advised them that they could express their concerns to the YCP Captain on duty because he could override defendant Frey's determination.

40.   Defendants Stremmel and Moore took their concern to the Captain -- upon information and belief, being either Captain Daniel Strebig or Captain Adam Ogle.

41.   The Captain was unpersuaded by Defendants Stremmel's and Moore's plea; he saw no reason to disagree with defendant Frey's conclusions.

42.   Defendant Frey told defendant Spahr to continue the Intake process; she also told defendant Spahr about defendants Stremmel and Moore's concerns and that she (Frey) disagreed with them, concluding that Ms. Henry was not a suicide risk.

43.   Defendant Frey also told defendant Spahr to continue with the Intake process and, unless there was a "red flag" during Spahr's questioning of Ms. Henry, defendant Spahr should verify in the computer program that Ms. Henry was not at risk for suicide.

44.   None of the defendants placed Ms. Henry on suicide watch or had Ms.

Henry evaluated by a psychiatric specialist or other mental health provider.

45.  PrimeCare knew that neither defendant Frey nor defendant Spahr was
     qualified to perform a mental health or suicide assessment

46.  On September 14, 2015 at approximately 11:50 p.m., defendant Spahr
     conducted the standard intake medical screen for Ms. Henry, asking her the
     prompted questions from the computer program.

47.  Defendant Spahr noted that Ms. Henry's prior incarcerations included
     problems related to "psychological/mental health segregation psychological/
     medication-assessment substance abuse."

48.  Ms. Henry told defendant Spahr that she had experienced a significant loss
     within the last six months (e.g. loss of job, loss of relationship, death of
     close family member).

49.  Ms. Henry told defendant Spahr that she was very worried about major
     problems other than her legal situation (e.g. financial or family problems, a
     medical condition, fear of losing job).

50.  Ms. Henry told defendant Spahr that she has a mental health treatment
     history as well as a history of drug or alcohol abuse.

51.  Ms. Henry told defendant Spahr that she was addicted to several medications
     including Xanax and Percocet.  Opiate withdrawal was identified as a one of
     Ms. Henry's problems at the time of the medical screen.

52.  Ms. Henry told defendant Spahr she felt she needed to see a mental health

provider.

53. Ms. Henry told defendant Spahr that she suffered a head injury in a motor vehicle accident earlier that day.

54. Upon information and belief, defendant Spahr knew that defendants Moore and Stremmel believed Ms. Henry was going to commit suicide and did not document this as part of the medical screen.

55. Defendant Spahr had the authority to put Ms. Henry on suicide watch if the suicide screening during Intake showed that Ms. Henry was at high risk.

56. According to PrimeCare's policy, an arrest for a "high profile" crime is alone sufficient to place a prisoner on suicide watch.

57. Ordinarily, the crimes with which Ms. Henry was charged, which included double homicide, would automatically place Ms. Henry at high risk for suicide and alert all correctional officer defendants and medical defendants that she should be placed on suicide watch.

58. On the other hand, Paul Jackson Henry III, Ms. Henry's husband, was charged with the same double homicide and related charges.  He was admitted to YCP but, unlike Ms. Henry, was immediately placed on suicide watch.

59. Paul Jackson Henry III was ultimately convicted on the double homicide charges and is serving a life sentence

60. Despite numerous signs that Ms. Henry had a particular vulnerability to

suicide, and knowledge of that vulnerability, no defendant placed Ms. Henry
on suicide watch, no defendant took steps to make sure Ms. Henry was seen
by a mental health professional and no defendant took any steps to make
sure Ms. Henry was subject to appropriate restrictions or observation to
prevent her from harming herself.

61.   Ms. Henry was transferred to cell #4B on September 15, 2016 at
      approximately 12:14 a.m.

62.   Sometime after 7:00 a.m., Ms. Henry left her cell for the shower where she
      rinsed and dried her hair.

63.   Around 9:20 a.m., she left her cell for the medicine line.  She asked the
      administering nurse for withdrawal medicine but she was never given it.

64.   At approximately 10:11 a.m. on September 15, 2016, Ms. Henry was found
      hanging in her cell from a white bed sheet that was tied to a bar on a
      window.  She was pronounced dead that same day.

65.   Upon information and belief, prior suicide victims at YCP -- especially
      females -- have hung themselves from the bars on their cell window, in the
      same way as Ms. Henry.

66.   Prior to Ms. Henry's suicide, the YCP was plagued with instances where
      sufficient precautions were not taken to prevent inmates from taking their
      own lives.

67.   Despite having notice that the window bars were an easy and accessible tool

for committing suicide, YCP and/or the Prison Board and/or Defendant Sabol never made design changes or otherwise remediated the danger that the window bars presented to those at risk for suicide.

68.    According to published accounts of the YCP suicide prevention problems, inmate Michael Lowery hung himself in a staff bathroom in 2009, detainee Tiombe Carlos took her own life in 2013 and two female inmates – Megal Fritz and Mary Knight – committed suicide within a four-day period in 2014.  See the December 17, 2016 article published by the York Daily Record attached as Exhibit A.

69.    Upon information and belief, PrimeCare was responsible for providing medical care, including suicide precautions, at the time of the YCP suicides referred to in the preceding paragraphs.  Moreover, PrimeCare has failed to provide adequate suicide precautions and training in countless instances of inmate suicide in prisons where PrimeCare operates throughout the Commonwealth of Pennsylvania and nationally.

70.    The fact that Ms. Henry was particularly vulnerable to suicide constitutes a serious medical need.

71.    The failure of York County and/or the Prison Board and the correctional officer defendants to ensure that proper medical treatment and attention was provided to Ms. Henry and that she was properly monitored despite knowing that suicide was a serious risk under the circumstances resulted in Ms.

Henry's death.

72.     At no time did any of the defendants, or any other employees of defendants York County and/or the Prison Board or PrimeCare, take steps to ensure that Ms. Henry was placed on a suicide watch.

73.     The correctional officer defendants, PrimeCare and the medical defendants were on notice of Ms. Henry's need for immediate medical attention and, with deliberate indifference, failed to take steps to ensure that she received the necessary care and treatment with a psychiatric specialist or other mental health provider.

74.     The correctional officer defendants, PrimeCare and the medical defendants were on notice of Ms. Henry's need for observation while in her cell and, with deliberate indifference, failed to take steps to ensure that she received the necessary observation.

75.     In light of their knowledge and/or observation of Ms. Henry's condition and the need for immediate treatment with a psychiatric specialist or other mental health provider, and in accordance with generally accepted standards of medical care, all medical defendants should have taken steps to ensure that Ms. Henry receive the necessary care and attention with a psychiatric specialist or other mental health provider.

76.     In light of their knowledge and/or observation of Ms. Henry's condition and the need for immediate treatment with a psychiatric specialist or other

mental health provider, and in accordance with generally accepted standards of medical care, all medical defendants should have taken steps to ensure that Ms. Henry was placed under observation upon her admission to YCP, until she was evaluated by a psychiatric specialist or other mental health provider.

77.     In light of their knowledge and/or observation of Ms. Henry's condition, the need for immediate treatment with a psychiatric specialist or other mental health provider, and the risk of suicide associated therewith, and in accordance with generally accepted standards, York County and/or the Prison Board and the correctional officer defendants should have taken steps to ensure that Ms. Henry was placed on a suicide watch and that she receive the necessary care and attention with a psychiatric specialist or other mental health provider.

78.     At all times relevant to this Complaint, defendants York County and/or the Prison Board, PrimeCare, Sabol and John Doe defendants, with deliberate indifference, failed to develop and implement policies, practices, and procedures to ensure that Ms. Henry would receive proper follow-up care, psychiatric intervention and be placed on suicide watch.

79.     The harms suffered by Ms. Henry are the direct and proximate result of the policy, practice, and custom of defendants York County and/or the Prison Board, PrimeCare, Sabol and John Doe defendants of refusing or delaying

inmates' necessary treatment with medical specialists, or otherwise interfering with such treatment and the placement of inmates on suicide watch.

80. Defendants York County and/or the Prison Board, PrimeCare, Sabol and/or John Doe defendants failed to take steps to ensure that information regarding inmates such as Ms. Henry – including but not limited to the inmates' reports of injuries, the results of examinations and tests, and the diagnoses of disorders – were promptly communicated to the inmates' other medical and mental health providers working in YCP as well as correctional officers and administrators so that medical services and placement on suicide watch were coordinated in such a way as to have avoided the harm sustained by Ms. Henry.

81. At all times relevant to this Complaint, all defendants were deliberately indifferent to the serious medical needs of Ms. Henry.

82. At all times relevant to the Complaint, all defendants were state actors acting under the color of state law and the conduct of all defendants, their agents, servants and/or employees, was intentional, willful, reckless, and grossly negligent with respect to Ms. Henry's rights under federal and state law.

83. Ms. Henry's death was a direct and proximate result of defendants' conduct.

84. Without any regard for Ms. Henry's safety, defendants ignored Ms. Henry's medical condition and denied her medical treatment that she desperately

needed.

85. Without any regard for Ms. Henry's safety, defendants ignored Ms. Henry's medical condition and failed to place her on a suicide watch despite knowing that there was a strong likelihood she would commit suicide.

86. Defendants failed to protect Ms. Henry and knowingly failed to provide her with medical treatment that she desperately needed.

87. As a direct and proximate result of the defendants' actions, Ms. Henry was deprived of rights, privileges and immunities under the Fourth, Fifth, Eight and Fourteenth Amendments to the United States Constitution and in particular the right to be free from cruel and unusual punishment, the right to be provided proper and adequate medical treatment and the right to due process of law.

## COUNT ONE

### Plaintiff v. Correctional Officer Defendants and Medical Defendants
### Federal Constitutional Claims

88. Plaintiff hereby incorporates the foregoing paragraphs as if fully stated herein.

89. The correctional officer defendants and medical defendants acted under color of state law, as provided in 42 U.S.C. §1983.

90. The correctional officer defendants and medical defendants, as well as John Does I-V, were deliberately indifferent to Ms. Henry's serious medical needs

and thereby violated Ms. Henry's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and/or Ms. Henry's right to substantive due process of law under the Fourteenth Amendment to the United States Constitution.

91.  As alleged above, the correctional officer defendants and the medical defendants knew that Ms. Henry was particularly vulnerable to suicide and that there was a strong likelihood that she would attempt suicide, and notwithstanding the knowledge of a significant risk to Ms. Henry's health and safety, they were deliberately indifferent by failing to take any action or precaution to prevent Ms. Henry from hanging herself, such as placing her on suicide watch or providing her adequate psychiatric care and treatment.

92.  The risk of suicide attempt by Ms. Henry was obvious and/or known to defendants.

93.  The correctional officer defendants and the medical defendants intentionally and/or with deliberate indifference ignored this risk and allowed, facilitated, and/or enabled Ms. Henry to hang herself.

94.  The omissions and failures committed by the correctional officer defendants and the medical defendants regarding Ms. Henry's mental health needs were outrageous and shock the conscience.

95.  Ms. Henry's death was a direct result of the actions and inactions of these defendants.

## COUNT TWO

### Plaintiff v. Defendants York County and/or the Prison Board,
### PrimeCare and Sabol
### Federal Constitutional Claims

89.    Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

90.    As a direct and proximate result of all defendants' conduct, committed under color of state law, and the deliberate indifference of defendants York County and/or the Prison Board, PrimeCare, Sabol and John Doe defendants to Ms. Henry's serious medical needs, Ms. Henry was denied the right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and/or to substantive due process of law under the Fourteenth Amendment to the United States Constitution.

91.    As a result, Ms. Henry suffered serious harm and loss of life in violation of her rights under the laws and Constitution of the United States, in particular the Eighth and Fourteenth Amendments, and 42 U.S.C. §1983.

91.    The violations of Ms. Henry's constitutional rights, Ms. Henry's damages, and the conduct of the individual defendants were directly and proximately caused by the deliberate indifference of York County and/or the Prison Board, PrimeCare, Sabol and John Doe defendants to the need for training, supervision, investigation, monitoring, or discipline with respect to the provision of specialized medical care to inmates.

92.   York County and/or the Prison Board have a constitutional duty to provide adequate mental health care to prisoners.

93.   PrimeCare has a constitutional duty and/or contractual obligation to provide mental health services to YCP prisoners.

94.   Notwithstanding their obligation, York County and/or the Prison Board and PrimeCare have failed prisoners, including Ms. Henry, in the provision of mental health services.

95.   The failure of York County and/or the Prison Board and PrimeCare to provide mental health services has been repeated over and over again as evidenced by the alarming number of suicides at YCP.

96.   The failure of York County and/or the Prison Board and PrimeCare to provide mental health services is borne out by their 900+ occasions of suicide concerns in 2014.

97.   With the dismal and tragic record of suicide and suicide concerns at YCP, neither York County nor the Prison Board nor PrimeCare provided for a mental health care professional to be physically present at YCP, 24 hours a day, 7 days a week.

98.   According to PrimeCare's CEO, the fact that no mental health professional is on site at YCP after hours is "appropriate."

99.   Being in the business of housing prisoners, York County and/or the Prison Board and PrimeCare know that arrests are made at any hour and,

consequently, prisoners enter YCP at all hours of the day and night.

100.   Being in the incarceration business, York County and/or the Prison Board and PrimeCare know or should know that it is not unusual for prisoners to enter YCP with serious mental health issues, including homicidal and suicidal tendencies.

101.   York County and/or the Prison Board and PrimeCare know that prisoners are at the highest risk of suicide during the two days following their admission to prison.

102.   York County and/or the Prison Board and PrimeCare utilizes a computer program during Intake to screen and rate prisoners at risk for suicide, said computer program being inflexible and altogether lacking in a contemporaneous and independent assessment by a trained mental health professional.

103.   The same computer program cannot assess the truth or falsity of the answers provided by prisoners.

104.   The answers entered into the computer program lock; the computer program does not allow the user to go back and amend or correct previous answers.

105.   Notwithstanding the tragic and dismal record of suicides and suicide concerns at YCP, PrimeCare's CEO insists that there are "multiple forms of intake to capture inconsistencies."

106.   York County and/or the Prison Board and PrimeCare know or should know

that a medical assistant, like defendant Spahr, has limited medical
knowledge and skill and is unqualified to make decisions or diagnoses
regarding prisoners' mental health.

107.   York County and/or the Prison Board and PrimeCare know or should know
that a medical assistant is unqualified to identify a "red flag" that would
typically alert a mental health professional that a prisoner was suicidal.  Yet,
York County and/or the Prison Board and PrimeCare had a procedure that
placed defendant Spahr in that precise circumstance.

108.   York County and/or the Prison Board, PrimeCare, Sabol and John Doe
defendants have adopted and maintained for many years a recognized and
accepted policy, custom, and practice of condoning and/or the acquiescence
of the deliberate indifference to serious medical needs of inmates, and
subjecting them to the same type of treatment to which Plaintiff was
subjected, which policy violates the Eighth and Fourteenth Amendments of
the Constitution of the United States, the laws of the United States and of the
Commonwealth of Pennsylvania, in violation of 42 U.S.C. § 1983.

109.   The aforementioned unconstitutional policy, custom and practice includes
failing to provide adequate policies and procedures for identifying persons who
are high suicide risks, and failing to have adequate policies and procedures for
addressing persons who are suicidal, such as placing them on suicide watch
and providing them with adequate psychiatric medical care.

110.   The aforementioned unconstitutional policy, custom and practice includes
knowingly and intentionally allowing low level medical personnel to provide
care and treatment, including but not limited to mental health assessments,
which they are not qualified to provide.

111.   The aforementioned unconstitutional policy, custom and practice includes
knowingly and intentionally violating regulations set forth by the Pennsylvania
Department of State regarding the permitted treatments rendered by and
supervision of medical assistants, LPNs and RNs.

112.   The aforementioned unconstitutional policy, custom and practice is based on
defendants' desire to save money by not providing the required medical care
and treatment and also a systemic belief that prisoners are manipulative and
their psychiatric needs, even if suicidal, does not deserve medical care and
treatment.

113.    York County and/or the Prison Board, PrimeCare, Sabol, and/or John Doe
defendants have adopted and maintained for many years a recognized and
accepted policy, custom, and practice of failing to adequately train prison
and medical staff employees regarding the warning signs of potential
suicides, and failing to adequately train them regarding the necessary
precautions to avoid suicides, and of failing to discipline employees who
allow suicides to occur on their watch.

114.   York County and/or the Prison Board, PrimeCare, Sabol, and/or John Doe

defendants, have been deliberately indifferent and act with reckless disregard of the right of inmates at YCP to be provided with essential medical care, which deliberate indifference and reckless disregard violated Ms. Henry's rights under the Eighth and Fourteenth Amendments of the Constitution of the United States, the laws of the United States and of the Commonwealth of Pennsylvania. *See* 42 U.S.C. § 1983.

115.  Prior to September 14, 2016, York County and/or the Prison Board, PrimeCare, Sabol, and/or John Doe defendants, knew or should have known of the above described policy and that it deliberately, knowingly, and/or negligently failed to take measures to stop or limit the policy, including, inter alia, providing proper training, supervision, and control of the officers, agents, and/or employees of YCP and/or PrimeCare.

116.  PrimeCare's CEO concedes that "the additional steps that could have changed the outcome" in this case "are virtually limitless."

117.  Despite the limitless additional steps that were available, York County and/or the Prison Board, Prime Care, Sabol and or John Doe defendants, failed to do so and proximately caused Ms. Henry's death.

118.  The omissions and failures committed by York County and/or the Prison Board, Prime Care, Sabol and or John Doe defendants regarding Ms. Henry's mental health needs were outrageous and shock the conscience.

119.  By failing to take action to stop or limit the policy and/or by remaining

deliberately indifferent to the systematic abuses which occurred in accordance with and as a direct and proximate result of the policy, York County and/or the Prison Board, PrimeCare, Sabol, and/or John Doe defendants, condoned, acquiesced in, participated in, and perpetrated the policy in violation of Ms. Henry's rights under the Eighth and Fourteenth Amendments of the Constitution of the United States, the Constitution of the Commonwealth of Pennsylvania, the Laws of the United States and of the Commonwealth of Pennsylvania. *See* 42 U.S.C. § 1983.

120. The violations of Ms. Henry's constitutional rights were directly and proximately caused by the encouragement, tolerance, ratification of, and/or deliberate indifference of York County and/or the Prison Board, PrimeCare, Sabol, and/or John Doe defendants to, policies, practices, and/or customs of refusing, delaying, failing to coordinate, or otherwise interfering with inmates' necessary treatment with mental health professionals.

121. The violations committed by York County and/or the Prison Board, Prime Care, Sabol, and/or John Doe defendants involved, among other things, their failure to develop and implement policies, practices and procedures that would ensure that inmates receive proper mental health care from certified mental health professionals and that suicidal inmates are placed on suicide watch.

122. Ms. Henry's death was a direct result of the actions and inactions of these

defendants.

## COUNT THREE

### Plaintiff v. Medical Defendants, PrimeCare and York County and/or the Prison Board
### <u>State Law Negligence Claims</u>

122.   Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

123.   The medical defendants had a duty to comply with generally accepted medical standards of care in their treatment of Ms. Henry.

124.   The medical defendants violated their duty of care to Ms. Henry.

125.   The medical defendants' acts and omissions constitute willful misconduct and/or gross negligence.

126.   The medical defendants' violations of their duty of care to Ms. Henry was a direct and proximate cause and a substantial factor in bringing about Ms. Henry's damages outlined above, and, as a result, the medical defendants are liable to plaintiff.

127.   The medical defendants' acts and omissions were outrageous and shock the conscience.

128.   As the individual medical defendants were acting as agents, servants, and/or employees of York County and/or the Prison Board and/or PrimeCare, and were acting within the scope and course of their employment, and under the direct control and supervision of York County and/or the Prison Board and/

or PrimeCare, York County and PrimeCare are liable to plaintiff on the basis

of *respondeat superior* liability.

**COUNT FOUR**
**Plaintiff v. Defendants**
**<u>Wrongful Death</u>**

129.   Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth

herein.

130.   As a result of the aforesaid negligent acts and/or omissions of defendants

resulting in Ms. Henry's death, Ms. Henry's survivors have suffered

damages for pecuniary loss including but not limited to the following:

> a.  funeral, burial and estate administrative expenses;
>
> b.  medical expenses; and
>
> c.  such other pecuniary losses recoverable under
>     the Wrongful Death Act and applicable
>     Pennsylvania law.

131.   As a result of the aforesaid negligent acts and/or omissions of defendants

resulting in Ms. Henry's death, Ms. Henry's survivors have suffered, and

will continue to suffer for an indefinite time in the future, and claim

damages for losses including but not limited to the following:

> a.  loss of the pecuniary value of the services,
>     society, comfort, companionship, maintenance,
>     guidance, tutelage, moral upbringing,  support,
>     protection and enjoyment which decedent
>     would have provided for the remainder of
>     decedent's natural life; and

    b.  such other pecuniary contributions the survivors could have expected to receive from the decedent and were caused to lose as a direct and proximate result of defendants negligence and carelessness; and

    c.  such other losses recoverable under applicable Pennsylvania law.

132.  On behalf of the Wrongful Death beneficiaries, the Administrator claim damages for the monetary support the decedent would have provided to the beneficiaries during her lifetime.

**COUNT FIVE**
**Plaintiff v. Defendants**
**<u>Survival Action</u>**

133.  Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

134.  Plaintiff claims damages for Ms. Henry's pain and mental suffering prior to her death, and the loss of earning capacity suffered by Ms. Henry from the time of her injury until such time as she probably would have lived had she not died as a result of the defendants' negligence as described above.

133.  Plaintiff brings this action on behalf of the Estate of Veronique Aundrea Henry, deceased, pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. §8302 and claims all damages encompassed thereby on behalf of said Estate.

**<u>REQUESTED RELIEF</u>**

Wherefore, Plaintiff respectfully requests:

1.  Compensatory damages;

2.  Punitive damages against the individual correctional officer defendants, individual medical defendants, York County and/or the Prison Board and PrimeCare Medical, Inc.;

3.  Reasonable attorneys' fees and costs;

4.  Such other and further relief as may appear just and appropriate.

5.  Plaintiff hereby demands a jury trial as to each count and each defendant.

<u>/s/ Leticia C. Chavez-Freed</u>

Leticia Concepcion Chavez-Freed
THE CHAVEZ-FREED LAW OFFICE
2600 N. 3rd Street
Harrisburg, PA  17110
(717) 893-5698
*Counsel for Plaintiff Richard Reilly,*
*Administrator of Estate of Veronique Henry*

Dated:  December    , 2020