EXHIBIT "I"



## *Michael Puerini, MD, CCHP-A, FACCP*
*Salem Oregon 97306*
*Email ssnag@yahoo.com*
*Telephone 503-551-7473*

January 6, 2021
**Report of Findings and Medical Opinions Michael T. Puerini, MD, CCHP-A**

### *Introduction*

This report is a statement of findings and medical opinions concerning the care delivered to Ms. Veronique Aundrea Henry, Date of Birth 9/6/1984 while she was housed at the York County (Pennsylvania) Prison ("YCP") from 9/14/2016 to 9/15/2016, when she died. It serves as a summary of care and my preliminary opinions subsequent to my review of the case, and is based upon my personal knowledge, education, training, experience, research, and facts to which I am privy. I have personally produced this document as my individual formulation based upon the facts that I have read. This document is produced at the request of Ms. Leticia Freed-Chavez, Esq. of the Chavez-Freed Law Office in Harrisburg, Pennsylvania.

### *Qualifications*

I am a correctional physician specialist, having spent over twenty-five years of my career practicing medicine in both juvenile and adult correctional facilities. Over the course of my career I have worked with, and directly or indirectly supervised and taught registered nurses (RN), licensed practical nurses (LPN), mid-level practitioners (nurse practitioners and physician assistants) and primary care physicians both in correctional settings and in the community.

I am a medical school graduate of the Creighton University School of Medicine, having graduated in 1984. I completed my Internship and Residency in Family Medicine in 1987 at Brown University-Memorial Hospital of Rhode Island, where I was chief resident in my final year. I am a physician licensed to practice medicine in the State of Oregon and am Board eligible in Family Medicine.

I am an Advanced Certified Correctional Health Professional (CCHP-A), one of approximately fifty individuals so certified. I am the Past President of the American Academy of Correctional Physicians ("ACCP"), a national medical organization with offices in Marion, Massachusetts. I have served on the Board of Directors of the ACCP from 2005 until 2015, and I have been the Chair of the Policy and Practice Steering Committee. I continue to serve on the education committee. I teach correctional health care principles, including practice standards related to the practice of correctional health care professionals, to national and regional audiences of physicians, mid-level practitioners, nurses, and other health care professions.

I have been the Chief Medical Officer of the Oregon State Correctional Institution ("OSCI") since 1998, until my retirement in May, 2016. I also served on the Nursing Protocol Committee,

performed all mortality reviews for the Oregon Department of Corrections ("ODOC"), and acted as the Assistant to the Medical Director.

Since retiring my full time position, I have returned to work part time for the ODOC, performing many of my prior responsibilities on a part time basis. I am the director of physician education for the ODOC, planning a regional medical education program twice yearly. I assist in planning national and regional programs of education for physicians who work in correctional settings. I have practiced primary care medicine in a correctional institution setting since 1992, but currently do not do direct patient care. The clinical practice of medicine in correctional institutions remains my primary professional focus.

I investigate, monitor, or evaluate the safety and appropriateness of health care delivery in correctional institutions in my role as medical consultant for the Wyoming Department of Corrections and the Philadelphia Department of Prisons. I had a similar role in the past while serving as physician accreditation surveyor for the National Commission on Correctional Health Care ("NCCHC"), and as an administrator at the ODOC. Additional details of my credentials to evaluate and offer opinions in this case can be found in my Curriculum Vitae, which is attached.

### *Testimonial Information and History*

I review cases and act as an expert witness in select cases, and have been deposed five times as an expert witness, as follows.

Stefan Woodson v. City of Richmond, Virginia, et. al., Deposition on November 24, 2014
David Smith vs. Campbell County Kentucky, et. al., Deposition on March 16, 2018
Terri Carlisle v. Douglas County, Oregon, et. al., Deposition on October 15, 2018
Paris Loving-Johnson v. Kaihrul Emran, MD and NaphCare Inc, Deposition on December 16, 2019
Randy Dunn v. Centurion Correctional Healthcare of New Mexico, Deposition on March 10, 2020

I have not testified as an expert witness at trial.

### *Fees*

I have accrued approximately $6,000 in fees for the duration of the current case. My fee schedule is attached.

### *Methodology*

This is primarily a medical review. It is not substantially different from medical reviews that I conduct in my role as a consultant to jurisdictions that request my review and comments on cases unrelated to legal action. I review the materials presented, conduct research on medical standards when needed from national sources, and formulate opinions based on the facts of the case and my knowledge and experience. I conduct reviews independently and impartially; my opinions are based on medical standards and facts. The words written in this report are entirely my own.

*Documents Reviewed*

In preparation for giving my expert opinions in this case, I have received and reviewed the following documents, which I considered in forming my opinions:

- York County Prison ("YCP")Records re: Veronique Henry
- YCP Medical Records re: Veronique Henry
- Complaint—Reilley v York County Pennsylvania et. al.
- Pennsylvania State Police Report re: Veronique Henry
- Incident Reports, York County Prison re: Veronique Henry
- York County Prison Clinical Mortality Review re: Veronique Henry
- Forensic Pathology Associates Autopsy Report re: Veronique Henry
- Deposition of Amanda Spahr re: Veronique Henry
- Deposition of Sonya Frey re: Veronique Henry
- Deposition of Beth Sarago re: Veronique Henry
- Deposition of Krystal Kline re: Veronique Henry
- Deposition of Thomas Weber re: Veronique Henry

*Timeline and Summary of Facts*

Veronique Aundrea Henry ("Henry") was housed at the York County (Pennsylvania) Prison ("YCP") for just over 12 hours starting at approximately 10:30 PM on 9/14/2016. Henry was found unconscious and hanging in her cell at 10:11 AM on 9/15/2016. A "code" was called, EMS was notified at approximately 10:15 AM, and EMS appeared at approximately 10:30 AM. She was pronounced dead at the scene at 10:49 AM by EMS personnel on 9/15/2016.

Sonya Frey, an LPN employed by PrimeCare, and the "charge nurse", was called by YCP correctional officers Moore and Stremmel as she was preparing to leave the institution after her shift because they knew Ms. Henry from prior incarcerations at YCP. They were concerned about Henry being a suicide risk. Frey did an assessment, but did not do a suicide risk screening. She declined to place on suicide watch and left the building. She apparently had a conversation with Henry, the officers, and the medical assistant, Amanda Spahr. None of this is documented in the medical record.

Amanda Spahr, a medical assistant, subsequently did the intake assessment at approximately 11:50 PM on 9/14/2016. She did an intake review and a suicide risk assessment on Ms. Henry. While she knew that Frey, her supervisor, the "charge nurse" did not think Henry was a suicide risk, she was not aware that Stremmel and Moore had expressed concerns about Ms. Henry's safety.

*Testimonial History*

Amanda Spahr gave sworn testimony to the following: She was a medical assistant at the YCP at the time of Ms. Henry's suicide, working for PrimeCare, having started working there in 2014 or 2015. She did the suicide and intake medical screening on Henry in the late evening of 14-15, 2016. Before the screening Spahr had a conversation with the "charge nurse", Sonya Frey, an LPN, about Ms. Henry. Frey told her that she did not think Henry required suicide watch but that Spahr should just do the screening as routine. Spahr testifies that she had no conversation with Frey about

the correctional officers who knew Ms. Henry from prior incarcerations having concerns about Henry's being at high risk for suicide. She testified that during the intake, at the head of the suicide screen form, in block letters, the warning "Problems Recorded during prior incarcerations" (regarding mental health problems) appeared. Spahr did not check prior incarceration records so see what this meant, according to her testimony. She also testifies that medical assistants may place a patient on watch but only if the score on the suicide screen is eight or above. She agrees that she filled out the form to reflect that Ms. Henry requested mental health treatment, giving the importance a number one importance, that being the highest importance.

Spahr futher notes that Henry was addicted to benzodiazepine and opiate medications, and was prescribed psychotropic medication to treat a mental health condition. Spahr admits that she noted that Henry had no history of violent crime arrests, despite knowing that Henry was arrested for homicide for this intake.

Spahr testifies that Henry gave her a history of a motor vehicle accident with a head injury, and that she noted on the intake screening that "everything after the accident is a blur", indicating a possible concussive traumatic brain injury. According to testimony, Spahr gave no immediate attention to this important factor.

Finally, Spahr testifies that Henry gave an intake diagnosis of "MRSA history", having to do with "mental health". She did not apparently have enough knowledge to know that MRSA is usually a skin condition and never a mental health condition.

Sonya Frey testifies that she was called upon at the change of shift to evaluate Veronique Henry, a woman, recently incarcerated, who she did not recall ever meeting prior to that evaluation. Officers Moore and Stremmel, who were well acquainted with Ms. Henry from prior incarcerations, were worried about Henry being at risk of suicide. Frey testifies that it was "unusual" for her to be called by custody staff with concerns even before the intake evaluation, but did not authorize a suicide watch for Henry despite the officers' concerns.

Frey testifies that she then spoke with the medical assistant, Ms. Spahr, who would do the intake history on Henry, but does not remember telling Spahr about the officers' concerns. Frey admits during testimony that she was cited in writing about the incident because she did not document either of these important interactions in Ms. Henry's medical chart. Frey documented neither the evaluation she did of Ms. Henry at the request of custody staff, nor the discussion that she had with Ms. Spahr as her supervising "charge nurse".

Also found in sworn testimony is the fact that Frey admits that she was not well versed in suicide prevention (she did not know, for example, that most suicides happened within 48 hours of incarceration), was not a trained member of the mental health team, and did not recall being trained in suicide prevention. Frey testifies that she made a "judgment call" and admits that she consulted no other person with more experience about this assessment and the decision to withhold suicide precautions from Ms. Henry. It is clear that, in order to initiate suicide precautions on Ms. Henry, Frey would have needed to spend a considerable amount of time in fulfilling the necessary steps. She further testifies that she did not know that Ms. Henry had, during the course of being arrested, been involved in a serious motor vehicle accident and had suffered a head injury.

Beth Sarago testifies as the Director of Nursing at the YCP at the time of Ms. Henry's death; that she present during the "code" after Henry was found hanging in her cell. Sarago is an RN with an

Associates degree in nursing. She testifies that there are exceptions to the 8 score on the suicide screen. (In her testimony, Sarago incorrectly characterizes the suicide screening form as having exceptions, but in fact, some questions score an automatic 8, and automatically qualify the patient answering yes to these questions for immediate suicide precautions.) Sarago further testifies that the medical assistant doing the intake and suicide screens are expected to call the "charge nurse" at YCP (an LPN) if there are questions about the patient. Mental health is "separate" from the usual nursing care, provided by professionals not employed by PrimeCare. Sarago cited Frey in Frey's personnel file for not documenting her interactions with Ms. Henry, the correctional officers and Ms. Spahr.

Krystal Kline testifies as an LPN at YCP. She is a med-line nurse. She testifies that if a patient comes to med line requesting a medication ordered by a medical provider, the nurse doesn't ever refuse to give that medication. She testifies that she was present at the "code"; Ms. Henry was given Narcan for three doses during the "code" subsequent to her being found hanging in her cell.

Thomas Weber testifies as the CEO and part-owner of Prime Care. He is an attorney by profession. He testifies that correctional officers at YCP can initiate a suicide watch on their own, without any input from PrimeCare nursing staff. He testifies that it's normal procedure to provide education to the patient to get help if they feel suicidal. He testifies that Frey did not do a suicide screening when she was called by correctional officers to evaluate Ms. Henry for suicide risk. He further testifies that nurses and other staff should not rely on patients to report suicide risk truthfully; that patients know the limited movement and privileges involved in being on suicide watch.

Weber further testifies that it is NOT the patient's responsibility to report suicide intent, that other risk factors must be taken into consideration, especially with high risk patients. He testifies that "additional steps that could have changed the outcome of this are virtually limitless", and that "patient safety comes first. It has to." He also references "someone who is less than candid on a suicide screen because they don't want to be put in a turtle suit", but does not acknowledge other factors that may motivate a patient not to be candid, such as suicidal intent and plan. He testifies that mental health staff are available 24/7 to field questions when "something out of the ordinary presents itself". He references these as "lifelines to seek additional help". He testifies that "not everybody should be on suicide watch" and gives reasons under oath why this is so.

**Opinions**

Subsequent to my review of the Henry case, I hold the following opinions to a reasonable degree of medical certainty:

1. Veronique Aundrea Henry, a then 32year old female, died while incarcerated at the York County (Pennsylvania) Prison, as a direct result of the substandard care delivered by health services and custodial staff working at that institution. Ms Henry was found hanging from her neck in her cell on 9/15/2016, and she subsequently died. Ms. Henry died unnecessarily. Her death was preventable had he simply received appropriate care that met reasonable standards of patient care.
2. Ms. Henry was placed on no suicide precautions during the short time that she was incarcerated at YCP, which was a clear breach of the standard of care. Identification of those at risk for suicide is a fundamental part of the intake process at any jail. Healthcare staff at the YCP,

specifically Spahr and Frey, knew or should have known that Henry was at extremely high risk of suicide for the following reasons:
   a. Ms. Henry was incarcerated due to very serious, violent charges.
   b. She had been recently incarcerated.
   c. Henry was incarcerated for a high profile crime.
   d. She had a prior history of psychotropic medication use while incarcerated, having been prescribed no fewer than eight different medications for mental health treatment, most while incarcerated at YCP.
   e. Henry had one or more mental health diagnoses known prior to this incarceration.
   f. The YCP chart documents that, on transfer from SCI Muncie to YCP on 7/19/2015, she had diagnoses of severe depression and paranoid schizophrenia, both serious mental illnesses (SMI).
   g. Correctional officers who were well acquainted with her from prior incarcerations considered her to be a suicide risk.
   h. She suffered from drug addiction and was at risk for withdrawal.
   i. She had recently suffered a head injury. Head injuries can cause impaired judgment.
   j. Incarcerated female patients, especially those with minor children are at high risk.
   k. There existed a very real risk of Henry's losing contact with her children (social isolation).
3. Ms. Henry was assigned to a single person cell, statistically placing her at further risk for suicide. No precautions were taken.
4. I find no solid evidence that PrimeCare healthcare staff Frey and Spahr underwent the standard annual suicide prevention training. Testimonial evidence does not support effective knowledge of suicide risk on the part of Ms. Spahr and Frey, in my opinion.
5. Untrained and unqualified employees of PrimeCare (a for-profit company) decided that Ms. Henry was not a suicide risk despite the protests of correctional officers familiar with Ms. Henry to the contrary.
6. Despite controversy between the custody and healthcare staff regarding whether or not Ms. Henry was at risk for suicide, no higher level healthcare provider with more qualification or training was contacted about the issue. An LPN and a Medical Assistant made the decision without contacting a mental health professional or a medical provider for additional input, a breach of the standard of care.
7. A medical assistant, as Ms. Spahr testifies, is not qualified to make assessments or medical decisions. A licensed practical nurse, according to the nurse practice act of the state of Pennsylvania, is not qualified to make independent assessment of patients. Spahr and Frey were practicing outside of their scope of practice in independently deciding that Ms. Henry did not require suicide monitoring when the decision was placed into question by the custody officers. As a direct result, Ms. Henry successfully committed suicide less than 12 hours after that decision was independently made by unqualified staff members employed by PrimeCare.
8. The default standard for suicide prevention in correctional facilities is clear. Suicide precautions should be initiated when in doubt in anticipation of future qualified mental health evaluation. Again Frey was in violation of the standard of care in refusing to initiate suicide precautions for Ms. Henry against the advice of correctional officers who were well acquainted with her.
9. Ms. Frey testifies that, while she acknowledges it was "unusual" to be called by custody staff to evaluate a patient for suicide risk before the intake evaluation, she nevertheless did not consider the concerns of officers who knew Ms. Henry to be serious enough to initiate suicide precautions. This is a breach of the standard of care. It is my opinion, given my experience, that the fact that Ms. Frey was called on to perform the evaluation of Henry's suicide risk when she should have been off duty is an important link that was part of the proximal root cause of Ms. Henry's suicide.

10. The fact that Ms. Henry had suffered a head injury with memory loss is relevant in that the injuries were never medically evaluated before incarceration, a breach of the standard of care. Ms. Henry, when she gave such a history at the correctional institution, should have been evaluated at the local hospital emergency room. Recent head trauma often causes a patient to omit important details of history, and to suffer loss of impulse control. It is my opinion that the failure on the part of York County and PrimeCare staff members to get this important evaluation contributed to the negative outcome.
11. The YCP, despite having suffered multiple prior suicides, did little to ensure that cells were suicide resistant. Prior successful suicides at this facility, and Ms. Henry's death would have been preventable if the bars on the windows were not readily accessible to hang from.
12. The intake form for suicide screening at the YCP was flawed. An arbitrary decision based on a number of positive answers to questions does not value the flexibility needed in a correctional health care setting in evaluating suicide risk. There was no suggestion in the intake screening for when the medical assistant should call on a more experienced medical or mental health provider for further advice.
13. Spahr made mistakes and omissions on the intake suicide screen for Ms. Henry, and as such failed to meet the standard of care. The primary of these errors was in not designating Henry's accused crime as being "high profile".
14. PrimeCare hired Ms. Frey, an LPN, as the "charge nurse", a decision making position, without a Registered Nurse on duty to help advise her. Had an LPN not been in charge of important life or death decisions, Ms. Henry's death may well have been prevented.
15. The medcal record kept by PrimeCare for Ms. Henry is flawed because of the following factors:
    a. Frey failed to document her essential visit when she was called emergently to evaluate Henry for suicide risk by correctional officers. Frey did not document her interactions with correctional officers Moore and Stremmel. Neither did she document her conversation with medical assistant Spahr.
    b. The record shows that Henry received multiple medications by mouth at 10:10 AM on 9/15/2016. This was around the time that Henry was found hanging.
    c. The record shows that Dr. Cattell approved medications for Ms. Henry at 10:34 AM on 9/15/2016. At this point, Henry was apparently moribund.
    e. The times documented in the chart for the emergency response are approximate. No clear cut time line for the emergency care delivered to Ms. Henry is available in the medical record.
16. Correctional officers Stremmel and Moore are culpable in the preventable suicide of Ms. Henry in that testimony supports that correctional officers can initiate suicide watch for inmates they are worried about. They were worried but did not initiate suicide precautions. Apparently, they did not follow the written policy.
17. Had Ms. Henry been placed on suicide precautions, as dictated by reasonable caution regarding patient safety, and the standard of care, her death by suicide was preventable.

The opinions contained in this report are my own written words, based upon my understanding of the facts of the case as informed by my education, training, and experience in the field of primary care medicine and correctional health care. All of the opinions and conclusions stated herein are given to a reasonable degree of medical certainty. I reserve the right to amend or alter these opinions or to add any needed additional exhibits should further facts illuminate a need to do so, especially after any further investigation.

Sincerely,

/s/ Michael T. Puerini, MD, CCHP-A, FACCP

Michael T. Puerini, MD, CCHP-A, FACCP